[No. 26970. Department One. September 16, 1938.]

MATHILDA TUVESON, *Respondent,* v. J. M. COLMAN COMPANY et al., *Appellants.*[1]

[1]Reported in 82 P. (2d) 579.

*Ralph S. Pierce, Edwin J. Cummins,* and *Gordon H. Sweany,* for appellants Gjarde *et al.*

*Kumm & Hatch,* for appellants Maples *et al.*

*Bundy & Swale,* for respondent.

GERAGHTY, J.—Peder Gjarde was engaged under contract to construct a building for the J. M. Colman

Company at the southwest corner of First avenue and Pine street, in the city of Seattle. The building was to cover a plot having a frontage of 60 feet on First avenue and a depth of 110 feet back to an alley, 16 feet in width, running southerly from Pine street to a junction with Pike place midway between Pine and Pike streets. Pike place is a short public way running northwesterly from Pike street to Pine.

The alley was in general use as a public way by pedestrians in going to and from the markets on Pike street, and was covered with a roof, which, at the place here involved, had been supported by the wall of a building on the west side of the alley and the wall of a building, on the east, standing on the Colman plot. Preparatory to the erection of the new building, the old was taken down, and the alley roof was supported on the east side by 2 x 4 timbers.

When Gjarde entered on the work, he replaced these supports by timber posts 6 inches square. The supporting posts were 10 feet 6 inches high, and set 14 to 16 feet apart, except where an opening 20 feet wide was left for delivery of material to the site by way of the alley. The alley was paved with cement. The posts were set on this cement at the outer edge of the alley adjoining the property line. A shallow hole, an inch to an inch and a half in depth, was chipped into the pavement to make a footing for the posts. Three 2 x 6 timbers were nailed to each post and to the stringers under the roof for bracing.

The company from which Gjarde was receiving his lumber had contracted with Maples and McMillan to deliver the lumber by truck to the building site. While delivering a load of lumber on the premises, a truck belonging to Maples and McMillan, and driven by their employee Coles, ran into and knocked down one of the posts supporting the roof; the roof was not disturbed

by the collision. In its fall, the post struck Mathilda Tuveson, the plaintiff, a pedestrian in the alley, inflicting upon her the injuries for which she brought suit, naming the J. M. Colman Company, Gjarde and wife, and Maples and McMillan and their wives as defendants.

At the close of the evidence, the J. M. Colman Company was dismissed from the action. The case against the other defendants was submitted to the jury, and a verdict was returned in favor of the plaintiff. Challenges to the sufficiency of the evidence and motions for judgment notwithstanding the verdict or, in the alternative, for a new trial, were timely made by the defendants and denied. Judgment was entered upon the verdict. The defendants Gjarde and the defendants Maples and McMillan took separate appeals. After perfecting his appeal, Peder Gjarde died, and his executrix has been substituted as appellant.

The sufficiency of the evidence is challenged by both sets of appellants.

█ Coles, the driver for Maples and McMillan, called by respondent, testified that, in making the delivery out of which the accident arose, he entered the alley from Pine street, drove his truck a short distance south, and then backed onto the premises.

"When I stopped for the purpose of unloading the front of the truck was about four feet back and a little to the left of the post. I rolled the load back until it balanced but not until the back end was on the ground. I then got on the truck and gave it a little jerk back to start it tipping, then immediately threw it in first and went ahead to go out from under the lumber so that it would drop flat, which it did. As I went ahead the post was over to my right quite a little ways, and the ground being soft, it threw the truck a little to the right and struck it with the right edge of the bumper. I came to a stop right there. It would be

impossible to say how fast I was going; in moving four feet I couldn't say how fast I was traveling. At any rate the right side of the bumper struck the post and knocked it down, and it fell at almost a 45 degree angle, the top of the post being to the west and north. I didn't notice where the bottom of the post was."

This witness testified that, if the truck had moved straight ahead, it would have missed the post by a foot and a half; that, when the truck veered to the right, there wasn't anything he could do to stop it.

"There was only three or four feet of distance, and as it shifted it struck almost at the same time.. There was nothing to be done. I stopped immediately, as soon as I could."

J. F. Criddle, superintendent for appellant Gjarde, called by respondent, testified:

"The truck backed in with this big load of shiplap. I don't remember how many feet, but a large load, and backed in, and the driver wanted to know where to put it, and I showed him where to dump this load of lumber, and he gave me the ticket, as he generally does, showing the amount of lumber on the truck, and I signed the slip and gave it to him, and he took his chains off the lumber and rolled it off. . . . When the driver is rolling off a big load of lumber he uses the winch and runs it back. . . . A hand winch. And it gets on a balance—the load does—and one end hits the ground, of course, and then the truck is pulled out from under it and the load is let drop. . . . Q. . . . did the truck start up by the driver getting in the truck and pulling out, or did the lumber push the truck forward? A. I think the driver was in the seat making preparations to pull out from under the load. Q. Did you not in a deposition that was taken some weeks ago· . . . make a statement to this effect: 'Well, he came in with the load of lumber . . . Just as he got into the truck to pull out from under the load of lumber—just at that instant—the weight of the load pushed the truck ahead and hit the post'? Did you testify to that? A. I might have said

that, because the driver was in the seat and the engine was running. . . . Whether the load pushed it ahead or whether he had it in gear before as soon as the load dropped the truck moved ahead. . . . It moved ahead just as the load was dropping off. . . . I wouldn't say definitely whether the driver had the car in gear or not, but as the load slid off the truck went ahead."

We are clear that there was evidence enough to take the case to the jury on the issue of the negligence of the appellants Maples and McMillan.

■ There was some testimony from which it might be inferred that the truck was deflected from its course by reason of the loose earth. These appellants requested the court to instruct the jury that the mere skidding of an automobile is not an occurrence of such uncommon and unusual character that, alone and unexplained, it can be said to furnish evidence of negligence in the operation of a motor vehicle. The court denied the requested instruction, but gave the following instruction, which, we think, covered the issue adequately:

"If you find that the course of the truck was changed and the truck struck the post by reason of the soft or slippery condition of the ground which was not obvious to an ordinary prudent operator of such vehicles and that the operator exercised ordinary care in the operation of said truck, then your verdict should be for the defendants Maples & McMillan."

It was for the jury to find from the evidence whether or not the collision was owing to faulty driving, or to the deflection of the truck by soft earth, a condition which a prudent and ordinarily careful driver could not have foreseen.

■ The negligence charged in the complaint against the appellants Gjarde was that the posts supporting the roof were so placed, and so inadequately secured,

that there was at all times danger that any passing vehicle might collide with them and cause them to fall upon and across the alley, and upon any person therein.

The posts were erected to support the roof, and there can be no contention, based upon the evidence, that they were inadequate for that purpose. The respondent contends that the appellants Gjarde should have provided against the possibility of accident by installing supports for the roof strong enough to withstand the force of possible collision by vehicles using the alley. The posts were set at the outer edge of the alley, the one here involved being on the north side of a twenty-foot opening, left for ingress and egress of vehicles delivering material on the premises. The post was not struck down by a vehicle driving through the alley, but by a vehicle operating outside the alley. While the post stood on the outer edge of the alley, the result would have been the same if it had been placed in close proximity on the adjoining lot.

Having an independent contract for the erection of the building, the appellants had a right to provide for the delivery of material through the alley onto the premises. With a twenty-foot opening, there was sufficient room for the passage of vehicles for this purpose.

The respondent contends that, when the post, standing upon or in close proximity to the alley, fell and struck the respondent, a *prima facie* case of negligence was established. Assuming this to be so, the respondent did not rest upon the presumption, but, in making her case, called as witnesses the appellant Gjarde, Criddle, his foreman, and Coles, the driver of the truck. Criddle and Coles testified as to how the collision occurred; Gjarde and Criddle testified as to the manner in which the posts sustaining the roof

were erected, and their testimony on this head was not disputed.

We are of the opinion that this undisputed testimony establishes, as a matter of law, that the post was adequate for the purpose for which it was erected. *Scarpelli v. Washington Water Power Co.*, 63 Wash. 18, 114 Pac. 870. At most, the presence of the post was merely a condition which, but for the independent and unrelated negligence of the driver, would not have resulted in injury to the respondent.

▄ Gjarde's foreman, Criddle, directed the driver where to unload the truck, and the respondent argues that he was equally guilty of negligence with the driver, as he should have known the danger of unloading in such close proximity to the post. The respondent did not allege any negligence in her complaint in this respect, but she urges in her brief that the complaint should be deemed amended to conform to the proof. The objection to this suggestion is that, as to the Gjardes, the case was submitted to the jury wholly on the theory of the insufficiency of the post. The court instructed the jury that

". . . the defendants Peder Gjarde and L. Minda Gjarde, his wife, are not responsible for negligent operation, if any, of the lumber truck owned by the defendants Maples & McMillan, or any other negligent acts, if any, upon the part of Richard Coles, the driver of said truck."

This instruction became the law of the case, and to consider the complaint amended at this stage of the proceedings, would amount to holding the appellants negligent on a state of facts not submitted to the consideration of the jury by the trial court.

The motion of the appellants Gjarde for judgment notwithstanding the verdict should have been granted.

▄ The jury awarded the respondent damages in the sum of three thousand dollars. While the appel-

lants Maples and McMillan make no specific contention that this award is excessive, they assign error upon the refusal of the court to give instructions requested by them respecting the duty of the respondent to follow the directions of her physicians and to use ordinary care in reducing the extent of her injuries.

Immediately following her injuries, the respondent was taken to the Seattle General Hospital, where she remained for five months under the care of Dr. Christofferson. Testifying to her condition when she entered the hospital, he said she was nervous and upset and complained of pains in her chest and the side of her head, and of difficulty in breathing. She had a bruise on the right side of her head and had suffered a cerebral concussion. An X-ray disclosed that three ribs were fractured, with no displacement. She had traumatic pleurisy as the result of the chest injury. He thought she should have recovered from the effect of these injuries in the course of a month, but a nervous condition followed which, not being a specialist in nervous diseases, he could not explain. He testified that he had rendered her a bill for $424 for his services.

After leaving the general hospital, she lived at a hotel for two months; later, she entered private nursing homes, where she remained up to the time of the trial. Dr. Ruge, a psychiatrist, who attended her during this latter period, testified that his diagnosis of respondent's case was that she was suffering from traumatic neurosis, a disorder of the nervous system, a functional condition, or hysteria, which follows a head injury. He rendered her a bill for $150. Her charges at the hospital were $510, and she paid from forty to fifty dollars a month to the nursing homes. On the face of it, all this indicates that she was not

indifferent about medical treatment, although Dr. Ruge testified that the environment in the nursing homes was not the best, on account of their lack of facilities for massage and electric treatment.

We are not persuaded that the failure of the court to give the requested instruction constituted prejudicial error.

The judgment against the appellants Maples and McMillan is affirmed; the judgment against appellants Gjarde is reversed, and the judgment is remanded with direction to dismiss as to them.

STEINERT, C. J., HOLCOMB, SIMPSON, and MAIN, JJ., concur.